IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MARK A. KULA,

                    Plaintiff,

          vs.

DENIS RICHARD MCDONOUGH,
Secretary of the United States Department
of Veteran Affairs; and DEPARTMENT OF
VETERANS AFFAIRS,

                    Defendants.

**8:20CV80**

**MEMORANDUM AND ORDER**

The plaintiff, Mark A. Kula, claims he was discriminated against under the Rehabilitation Act in his job as chief of police for the Department of Veterans Affairs' Nebraska–Western Iowa Health Care System division based on his disability. The defendants, the Department of Veterans Affairs and its secretary, Denis Richard McDonough, move for summary judgment. Filing No. 55. Defendants also move to strike one of the exhibits Kula submitted in opposition to their summary-judgment motion. Filing No. 69. The Court grants Defendants' motion to strike and grants in part and denies in part their motion for summary judgment as set forth herein.

I.      **BACKGROUND**

The Department of Veterans Affairs' Nebraska–Western Iowa Health Care System (NWIHCS) provides police services to VA facilities in Nebraska and Iowa. Filing No. 56-2 at 2. Kula became a police officer with the NWIHCS in July 2007 and worked there until 2014. Filing No. 56-5 at 9, 13. Kula suffers from ischemic heart disease with lateral occlusion as the likely result of a so-called "silent" heart attack. *Id.* at 6. His heart

condition was the same in 2007 when he was hired as it was in 2012 and 2013 when the events at issue in this case occurred. *Id.* at 6–7.

In May 2011, Kula was promoted to chief of police, a position designated GS-13 Supervisory Security Specialist. Filing No. 56-2 at 2–3; Filing No. 56-5 at 12. As chief of police, Kula was responsible for the entire police service, including assisting other police officers if they had an emergency situation that required a supervisory officer. Filing No. 56-2 at 3. This could include covering a police-officer shift if the service was short of officers on a given day. Filing No. 56-1 at 4; Filing No. 56-2 at 3.

The VA Handbook relating to Security and Law Enforcement provides that all new applicants must undergo a medical examination. Filing No. 56-1 at 22. It also provides that incumbents "will be reexamined annually to determine their continued physical and emotional suitability to perform the functional requirements of the position." *Id.* at 25. The Handbook provides specific medical standards for VA police-department applicants and incumbents, including a requirement that police officers "be capable of arduous physical exertion." *Id.* This includes being able to carry people in emergency situations, running to assist victims, and interceding in physical disturbances. *Id.* The Handbook states that "[a]ny structural or functional imitation or defect which tends to interfere materially with a high degree of physical activity will disqualify" an applicant or incumbent. *Id.* As chief of police, Kula had to meet these qualifications as well. *Id.* at 3.

The VA's Clinical Occupational Health Guidebook outlines which examinations are mandatory. *Id.* at 5. It states that all prospective police officers must complete an EGK, CBC and chemistries, an audiology consult, respirator medical clearance, drug testing, and, as most relevant here, an exercise tolerance test (ETT) on which the applicant

achieves 10 METs (metabolic equivalents). *Id.* at 29. Incumbent police officers are required to complete an EKG, CBC and chemistries, and an audiology consult "if there is a question of hearing deficiency." *Id.* at 30. The Guidebook states that, as to incumbents, clinicians "should consider ordering an Exercise Tolerance Test (ETT) [10 METS (metabolic units)] – Bruce Protocol, if the individual has two or more risk factors for cardiovascular disease." *Id.* (brackets in original). The parties agree Kula has at least two risk factors for cardiovascular disease. Filing No. 56-5 at 7–8 (Kula admitted he had risk factors including being over age forty, having previously smoked, having previously been diagnosed with a heart condition, and having an unknown familial medical history due to being adopted). *Id.* at 8.

In 2012, Kula underwent an annual examination in his role as police chief, including an ETT. *Id.* at 7. He did not meet the required 10 METs on the ETT. *Id.* Defendants took no action against Kula at that time, and he remained as chief of police. *See id.*

In 2013, Kula underwent another annual examination, including an ETT. Filing No. 56-1 at 4–5. Kula again failed to meet the required 10 METs; he achieved 8.2 METs. *Id.* at 34. Defendants offered to let Kula re-take the ETT. *Id.* at 5. Kula also failed to achieve 10 METs on the second ETT. Filing No. 56-5 at 21; Filing No. 56-1 at 5. Because Kula did not meet the required 10 METs on the ETT, Defendants determined he could no longer continue in his role as chief of police. Filing No. 56-2 at 5; Filing No. 56-1 at 34 (letter to Kula from NWIHCS stating he no longer meets the requirements for VA police officer "[b]ecause you did not pass this component, [the ETT]").

Defendants assigned Kula to a temporary detail position at the Lincoln VA facility that included administrative duties focused on veteran satisfaction. Filing No. 56-1 at 6;

3

Filing No. 56-2 at 6.  From May 2, 2013, to September 30, 2013, Kula maintained this temporary detail position.  Filing No. 56-1 at 11.  Kula received the same pay and benefits in his temporary detail position but had to relinquish his police credentials and service weapon.  Filing No. 56-5 at 26–27.  He described the temporary detail position as "just sitting in an office."  Filing No. 56-5 at 32.

Kula made a request for accommodation in which he asked Defendants to waive the ETT requirement and return him to his position as police chief.  Filing No. 56-5 at 28; Filing No. 56-1 at 7; Filing No. 56-2 at 7.  Defendants denied Kula's request to be returned to chief of police and instead offered to provide him with an alternate accommodation, "[r]eassignment to a current approved vacancy for which you are qualified."  Filing No. 56-1 at 11, 40; Filing No. 56-2 at 7.  Defendants ordered Kula to submit an updated resume in order to "begin a vacancy search."  Filing No. 56-1 at 40.

On October 31, 2013, Kula requested a detail to teach at the VA Law Enforcement Training Center in Little Rock, Arkansas, for three weeks starting in January 2014.  Filing No. 56-1 at 14.  Defendants denied the request because he was needed for the day-to-day operations of the VA service in his temporary-detail role.  Id.

In July 2014, the VA posted a vacancy announcement for a chief-of-police position located in South Dakota.  Id. at 15.  Kula did not apply for the open police-chief position.  Id.  In his deposition, Kula stated "rumor has [it] the Associate Director [of NWIHCS] Harrison contacted them [in South Dakota] and said I was trouble."  Filing No. 56-5 at 38.

On May 8, 2013, Kula filed a workers compensation claim for a work-related shoulder injury.  Filing No. 56-2 at 8.  On December 16, 2013, Kula suffered a second work-related injury after hitting his head.  Id.  As a result of these injuries, Kula was on

light-duty assignment or leave for most of the period after he was removed as chief of police. *Id.* at 10. Kula applied for, and was granted, a disability retirement from the VA in October 2014. *Id.* at 12.

After undergoing an agency grievance process, Kula filed the present lawsuit on July 3, 2019. Filing No. 1. He asserted Defendants violated his rights under the RA by "1) failing to accommodate his disability by dispensing with the discretionary tolerance test" and "2) passing [him] over for available police officer positions because of his disability." Filing No. 13 at 8. Defendants now move for summary judgment on all his claims.

## II.   ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce admissible evidence to support" a fact essential to the nonmoving party's claim. Fed. R. Civ. P. 56(c)(1)(A) & (B). The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

### B.  Motion to Strike

After Defendants moved for summary judgment, Kula filed a brief and index in opposition. Filing No. 67; Filing No. 68. Defendants move to strike one of the exhibits Kula submitted, Exhibit B, located at Filing No. 68-1 at 49–55.[1] Exhibit B is a copy of the complaint of employment discrimination that Kula filed with the Department of Veterans

---

[1] Although Kula entitled pages 49 to 55 of Filing No. 68-1 a separate exhibit, "Exhibit B," he did not separately file it as an attachment.

Affairs during the administrative equal employment opportunity process. Filing No. 68-1 at 49–55. Defendants argue the complaint should be stricken because it is not properly authenticated because the only foundation for it is Kula's attorney's affidavit. Filing No. 70 at 2. Defendants argue Kula's attorney has no personal knowledge of the allegations contained in the complaint. Filing No. 70 at 2. Additionally, Defendants argue Exhibit B contains numerous inadmissible hearsay statements and should also be excluded for that reason. Filing No. 70 at 3.

In response, Kula states that he filed Exhibit B "for background only" and concedes that Exhibit B is "not essential to a resolution of this case." Filing No. 77 at 1-2. Because Kula agrees the Court should not consider Exhibit B in determining the merits of the summary-judgment motion, the Court grants Defendants' motion to strike it.

### C. Kula's Novel Statutory-Language Argument

Before addressing the merits of Kula's discrimination claims, the Court must address a new claim Kula sets forth in briefing. Kula focuses his brief on an argument over the statutory language relating to permissible medical examinations. Filing No. 67 at 4–10. Defendants argue Kula did not plead this cause of action in his amended complaint and thus waived it. Filing No. 72 at 14–15. The Court agrees this claim is not properly before it.

Section 12112(d) of the Americans with Disabilities Act (ADA)[2] prohibits certain medical examinations as follows:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

---

[2] The Rehabilitation Act incorporates the standards set forth in the ADA. *See* 29 U.S.C. § 791(f).

42 U.S.C. § 12112(d)(4)(A).  Kula argues that the ETT was not job-related or consistent with the VA's business necessity.  Filing No. 67 at 6.  He further argues that since this subsection of the ADA refers to prohibited exams for "employees" generally rather than for disabled workers, the Court should not focus on his individual situation but should assess the permissibility of the VA's ETT examination apart from his disability.  Filing No. 67 at 5.

However, Kula did not raise this claim in his amended complaint; he raised it for the first time in his brief in opposition to summary judgment.  *Compare* Filing No. 13 at 5 (amended complaint stating causes of action only for failure to accommodate and disparate treatment), *with* Filing No. 67 (opposition brief raising statutory language argument).  Kula's unpled cause of action is not properly before the Court.  *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) ("[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment.").

### D.  Discrimination Under the Rehabilitation Act

Kula claims Defendants discriminated against him under the Rehabilitation Act (RA) by failing to accommodate his disability and by overlooking him for other available police positions once they removed him as chief.  Filing No. 13 at 8.  He argues Defendants should have dispensed with the ETT and allowed him to keep his position as chief of police as a reasonable accommodation for his heart condition.  *Id.*  Defendants argue Kula is not a qualified individual under the RA because he was not able to perform the essential functions as chief of police, namely passing the ETT.  Filing No. 57 at 23-

25. Alternatively, they argue they did provide a reasonable accommodation to Kula by offering to reassign him to another position. *Id.* at 30. The Court finds there are disputed issues of material fact which preclude summary judgment on this issue.

The Rehabilitation Act makes it unlawful to discriminate against a "qualified individual with a disability" because of that disability. 29 U.S.C. § 794; *see also Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). Because the ADA and RA are similar in substance, "'cases interpreting either are applicable and interchangeable' for analytical purposes." *Bahl v. Cnty. of Ramsey*, 695 F.3d 778, 783 (8th Cir. 2012) (quoting *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999)); *see also* 29 U.S.C § 791(f) (stating that the standards under the ADA apply to RA claims). "[D]isparate treatment and failure to accommodate claims . . .. based on circumstantial evidence [are] consider[ed] under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019).[3] Accordingly, as to both his failure-to-accommodate and discrimination claims, Kula must first demonstrate that he is disabled, that he is qualified to perform the essential functions of his job, and that he suffered an adverse employment action because of his disability.

---

[3] Defendants argue that the *McDonnell Douglas* burden shifting does not apply in reasonable-accommodation cases, citing *Peebles*, 354 F.3d at 766. Filing No. 57 at 21. However, *Peebles* and other Eighth Circuit precedent do not stand for this broad proposition. Rather, in a reasonable-accommodation case, the Court still considers whether the plaintiff has made out a prima facie case of discrimination as set forth in *McDonnell Douglas. See, e.g., Higgins*, 931 F.3d at 669 (first assessing whether Higgins has made out a prima facie case of discrimination in considering his failure-to-accommodate claim). If the plaintiff has met this burden, the Court then inquiries into whether the employer has fulfilled its duty to accommodate the disability. *See, e.g., id.* at 671–72; *Peebles*, 354 F.3d at 767–68. Because there is no element of intent to discriminate in a reasonable-accommodation case, the Court does not engage in a further burden-shifting analysis regarding the employer's justification and whether the employee can demonstrate such justification is pretextual as it would in, for example, a disparate-treatment case. *See Peebles v. Potter*, 354 F.3d at 767 ("The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability.").

*See id.* The Court analyzes the elements of the prima facie case[4] before turning to the alleged failure to accommodate and the alleged disparate treatment.

### 1. Qualified Individual

Defendants argue Kula was not a qualified individual for purposes of the RA because he could not perform the essential functions of the job, with or without an accommodation. Specifically, they argue that Kula could not perform his job as police chief because achieving 10 METs on the ETT is an essential function of the job and he failed to do so. Filing No. 57 at 23–26.

"Essential functions of the job are 'fundamental job duties,' and the employer's judgment in this regard is considered 'highly probative.'" *Higgins*, 931 F.3d at 670 (quoting *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004). The following evidence is relevant in determining whether something is an essential function:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

*Id.* (quoting *Kammueller*, 383 F.3d at 786).

These factors are either neutral or weigh in favor of a finding that the ETT was not an essential job function. As to the employer's judgment regarding which functions are essential, the record reflects that Kula's position required a base level of physical fitness. This is because the police chief was required to be able to perform police-officer duties involving physical exertion, such as running to assist victims and interceding in physical disturbances. Filing No. 56-1 at 25. However, Defendants removed Kula because he

---

[4] Defendants concede that Kula is disabled and thus the Court need not further address this element. Filing No. 57 at 22.

failed his 2013 ETT which presumably indicated his lack of general physical fitness. The evidence is conflicting regarding whether the ability to score 10 METs on the ETT itself was essential to the police-chief position. Defendants point to the fact that the VA Clinical Occupational Health Guidebook requires an ETT for new hires. *Id.* at 29. They also point out that an ETT is recommended during incumbents' annual screenings if, like Kula, they have two or more cardiac risk factors. *Id.* at 30. However, Defendants concede that the guidebook's language regarding ETTs for at-risk incumbents is permissive rather than mandatory. *See id.* (stating that as to incumbents, clinicians "*should* consider ordering an [ETT] . . . if the individual has two or more risk factors for cardiovascular disease" (emphasis added)).

Furthermore, as to the other factors for determining an essential job function, it appears the written description for police chief did not include the physical examination requirements until it was modified in 2013, after Kula had been removed. Filing No. 56-2 at 8, 15; Filing No. 56-1 at 12. There is no evidence in the record as to the amount of time spent on the job performing the function required by the ETT or the consequences of not requiring the incumbent to reach 10 METs on an ETT. As to the experience of incumbents in the position, in 2012 Kula underwent an ETT and did not pass with the required scores of 10 METs. Filing No. 56-5 at 7. Nevertheless, Defendants did not require Kula to step down from his role after failing the 2012 ETT. *See id.* Rather, Kula continued in his job as chief of police until 2013 when he again failed the ETT, achieving a score of 8.2 METs. Filing No. 56-1 at 34. It was only after this second failed ETT that Defendants determined Kula could not perform the essential functions of his job and removed him as chief of police. Filing No. 56-2 at 5. That Defendants allowed Kula to

11

continue to act as chief of police for over a year suggests the ETT is not, in fact, an essential job function, even in the employer's view.  Whether the ETT is essential to the fitness requirement is a question of fact for the jury.  The evidence is not sufficient to rule in the defendant's favor as a matter of law.

Thus, for the limited purpose of the McDonald Douglas analysis, the balance of factors weighs in favor of finding Kula was a "qualified" individual based on the ETT being an essential function of the job, summary judgment in Defendants' favor is not appropriate on this basis.

### 2.  Adverse Employment Action

Defendants argue that even if Kula was a qualified individual under the RA, he nevertheless did not suffer an adverse employment action and thus they are entitled to summary judgment.  Filing No. 57 at 27–30.

"An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jones v. City of St. Louis*, 825 F.3d 476, 480 (8th Cir. 2016) (quoting *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804–05 (8th Cir. 2013)).

Defendants argue that because Kula kept his same pay, grade, and benefits, he did not suffer an adverse employment action.  Filing No. 57 at 28.  However, the record reflects Kula suffered a "material employment disadvantage" that "affect[ed his] future career prospects" by his removal from chief of police.  *Jones*, 825 F.3d at 480.  Kula had to relinquish his police credentials entirely.  Filing No. 56-5 at 26–27.  He was relegated

12

to unsatisfying desk work outside the police force, including "just sitting in an office." Filing No. 56-5 at 32. Rather than mere unpleasant minor changes to working conditions, these were major upheavals that greatly impacted and limited his future career prospects, including precluding him from working in the VA police service altogether. Thus, Defendants are not entitled to summary judgment on the basis that Kula did not suffer an adverse employment action.

Because the Court concludes Kula has made out a prima facie case of discrimination, it turns to the two claims he asserts: failure to accommodate his disability and disparate treatment for failing to consider him for open police positions.

### 3. Reasonableness of Accommodation

Defendants argue that even if Kula was disabled, qualified to perform the essential functions of his job, and suffered an adverse employment action, they are nevertheless entitled to summary judgment on his reasonable accommodation claim because they provided him with a reasonable accommodation. Filing No. 57 at 30–33.

"An individual requesting an accommodation must make a facial showing that reasonable accommodation is possible and that the accommodation will allow [him] to perform the essential functions of the job." Higgins, 931 F.3d at 671 (internal quotation marks omitted) (quoting Lipp v. Cargill Meat Sols. Corp., 911 F.3d 537, 546 (8th Cir. 2018)). "An accommodation is not reasonable if it requires an employer to 'reallocate or eliminate the essential functions of a job.'" Id. (quoting Faulkner v. Douglas Cnty., 906 F.3d 728, 733 (8th Cir. 2018)). An employer is not required to provide the specific accommodation requested or preferred by an employee. Scruggs v. Pulaski Cnty., 817 F.3d 1087, 1093 (8th Cir. 2016) (citing Cravens v. Blue Cross & Blue Shield of Kan. City,

214 F.3d 1011, 1019 (8th Cir. 2000)).   Rather, an employer only has to provide an accommodation that is reasonable.   *Id.* (citing *Cravens*, 214 F.3d at 1019).

Kula requested that Defendants waive the ETT-requirement and restore him to his position as chief of police.   Filing No. 56-1 at 8.   Defendants claim this accommodation was not reasonable because the ETT was an essential function of the job.   Filing No. 56-2 at 5; Filing No. 56-1 at 34.   However, as set forth above, the evidence demonstrates the ETT was not necessarily an essential job function for the chief of police.   Kula has demonstrated that waiving the ETT-requirement was both reasonable and would allow him to continue to perform the essential functions of the job.   *Higgins*, 931 F.3d at 671.

However, because an employee is not entitled to his or her preferred accommodation, the Court must also examine whether the accommodation Defendants claim to have provided Kula was reasonable or not.   There is scant evidence in the record regarding the alternative accommodation Defendants provided Kula.   In part, this appears due to the fact that not long after his removal as chief of police, Kula suffered two unrelated injuries resulting in him taking extended periods of leave and ultimately retiring from the VA.   However, Defendants also fail to present any evidence that the proposed accommodation they would have provided him in the absence of his injury retirement was reasonable.   The record reflects that in rejecting Kula's request that they waive the ETT and reinstate him to chief of police, Defendants offered an alternate accommodation of "reassignment to a current approved vacancy for which you are qualified."   Filing No. 56-1 at 36.   There is no evidence of what this vacancy entailed.   Because it is impossible to assess the reasonableness of this alternate accommodation without knowing what it is,

Defendants have not met their burden and are not entitled to summary judgment on Kula's reasonable-accommodation claim.

### 4. Disparate Treatment

Lastly, Defendants argue that even if Kula was disabled, qualified to perform the essential functions of his job, and suffered an adverse employment action, they are nevertheless entitled to summary judgment on his disparate-treatment claim that he was not hired for other available police positions. Filing No. 57 at 33–41.

Kula claims he was passed over for various police positions because of his disability. Filing No. 13 at 8. The Court construes this as a claim that he was treated less favorably than non-disabled individuals when considered for open police positions. "In disparate treatment cases, a similarly situated disabled individual is treated differently because of his disability than less- or non-disabled individuals." Peebles, 354 F.3d at 766.

Because Kula has not presented any direct evidence to support his claim of disparate-treatment discrimination, the Court employs the *McDonnell Douglas* burden-shifting analysis. *See Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 996 (8th Cir. 2014). First, Kula must make out a prima facie case of disability discrimination, that he is disabled, qualified to perform the essential functions of his job, and suffered an adverse employment action. *Id.* Next, "[t]he burden . . . shifts to defendant[s] to articulate a legitimate, nondiscriminatory reason for [their] action." *Id.* If they do so, the burden shifts back to Kula to show a genuine dispute whether Defendants' justification is pretextual.

As set forth above, as to Kula's prima facie case, Defendants concede he is disabled, and the Court concludes he is a qualified individual. Specific to his disparate-

treatment claim, Kula claims he suffered the adverse employment action of not being interviewed for the chief-of-police job in South Dakota and not being assigned to teach at the training academy.  Filing No. 13 at 8; Filing No. 56-5 at 37–38.  His claim of disparate treatment as to the South Dakota job fails before it starts because the undisputed evidence shows he never applied for this job.  Filing No. 56-1 at 14–15.  He cannot claim to have been treated differently from other applicants by not receiving an interview for a position he never sought.  As to Kula's claims that he was discriminated against by not being detailed to the teaching position, Defendants have offered a legitimate, nondiscriminatory justification: Kula was needed for the day-to-day operations of the VA service in his temporary detail role in Lincoln working on veteran satisfaction.  Filing No. 56-1 at 14.  Kula has not produced any evidence that this justification is a pretext.  *See generally* Filing No. 67 (Kula's brief in opposition failing to address evidence of pretext).  Accordingly, Defendants are entitled to summary judgment on Kula's disparate-treatment claim.

## III.   CONCLUSION

For the foregoing reasons, genuine issues of material fact preclude summary judgment in Defendants' favor on Kula's claims of discrimination under the Rehabilitation Act.

IT IS ORDERED:

1.  Defendants' motion to strike, Filing No. 69, is granted and pages 49 to 55 of Filing No. 68-1 are deemed stricken—the Court will not consider them for purposes of summary judgment;

2.  Defendants' motion for summary judgment, Filing No. 55, is granted as to Kula's disparate-treatment claim and is denied as to Kula's claim of failure to accommodate; and

3.  In accordance with Filing No. 58, the parties are ordered to contact the magistrate judge's chambers within ten days of the date of this order to set a conference to discuss the trial and pretrial conference settings.

Dated this 6th day of May, 2022.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

17